**RICHARD JASPER, Plaintiff**

v.

**LAVINA JAMES, Defendant**

Civil No. 121-1969

District Court of the Virgin Islands

Div. of St. Croix

October 29, 1973

RUSSELL B. JOHNSON, ESQ., Christiansted, V.I., *for plaintiff*

JOHN D. MERWIN, ESQ., Frederiksted, V.I., *for defendant*

CHRISTIAN, *Chief Judge*

OPINION

The plaintiff, Richard Jasper, has brought this suit in his representative capacity as the administrator of the estate of Phillipina Solomon Ifield. Named as defendant in the action is one Lavina James, who now holds the legal title to the real property in controversy, Lot No. 53A of Estate Grove Place, St. Croix, Virgin Islands. By order of the court, sua sponte, Joshua Ifield, surviving spouse of Phillipina Solomon Ifield, was joined as a party defendant, and John P. Burke, Esquire, appointed his guardian ad litem to represent his interest. Jasper, the plaintiff, is the son of the late Phillipina Solomon Ifield, the decedent whose estate he administers.

The decedent and Joshua Ifield were married on March 28, 1948. She had been previously married to one James Holder who predeceased her. While married to Holder, she and Holder had entered into a contract for the purchase of No. 53A from the St. Croix Labor Union. The evidence indicates that sometime prior to Holder's death, plaintiff's decedent completed the purchase of the tract of land by paying the full balance then remaining. However, for reasons not made clear in the evidence, a deed was not then issued to her. It was not until sometime after decedent's marriage to Ifield that the Labor Union executed and delivered the deed for No. 53A. Title was conveyed to Joshua Ifield as sole grantee.

Ifield, also, had undertaken to purchase a parcel of land at Grove Place from the Labor Union. The ownership of this parcel also subsequently conveyed by him to defendant James, is not involved in the present controversy.

Sometime in 1961, Lavina James, niece of Joshua Ifield, at that time, as now, a resident of New York City, made a

trip to St. Croix and paid several visits to the then elderly couple at their residence, located on No. 53A, which, incidentally, was comprised of some 0.3895 U.S. acres. By this time, Joshua Ifield was no longer able to work and was receiving some form of pension. Phillipina, then 80 years old, was totally blind and partially deaf. She was also completely illiterate as distinguished from her husband, who, it appears, was able to read and write to some degree, at least to the extent of signing his name. During one of her visits to the Ifield home, Lavina James claims that the Ifields brought up the matter of their real property and put forward the suggestion that they would convey their real property to her in return for her promise to come down from New York upon the death of the survivor of them and see to it that the said survivor was properly buried. Their understanding, according to her, contemplated that the surviving Ifield would look after the burial of the spouse who first died. Thereafter, defendant sought out an attorney and engaged the firm of YOUNG, ISHERWOOD, GIBBS & CARNEY to look after the conveyance. She it was who alone went to the attorneys, taking with her the Ifields' "papers", presumably their deeds from the Labor Union. Any instructions given to the lawyers were given by her for at no time did the lawyers confer with, or even see, the Ifields in connection with the preparation and execution of the deed. After the execution of the deed on September 22, 1961, Mrs. James then returned to her home in New York.

In 1962, allegedly unaware of the prior conveyance to James, plaintiff, at his mother's suggestion, he testified, built his home, a second structure on No. 53A. Since that time he has paid the property tax on the dwelling, while Mrs. James has paid the tax on the land. He claims that he first learned of defendant's interest in the land when she visited St. Croix, early in 1963, after Mr. Ifield had suffered a stroke. It is the contention of the plaintiff that both

the conveyance from the Labor Union to Ifield and the one from his mother and Joshua Ifield should be annulled, and that his mother, and consequently her estate, should be declared the owner, in equity, of Plot No. 53A Grove Place.

Although there is no evidence as to Mrs. Ifield's health and mental capacity in 1961, it is clear that, for at least several years preceding her death in 1967, at the age of 86, she was blind, partially deaf, and always illiterate. It is also a fact that the defendant James is extremely attached to her uncle Joshua Ifield, by virtue of having been brought up as a child in his mother's home, in which he too lived.

On her part, Mrs. James declares that the conveyance was entered into with the full knowledge and consent of both grantors, for the consideration of $10, and the agreement that Mrs. James would arrange for the funeral of the surviving grantor. She offers as evidence of her good faith the fact that she has, from time to time, over the years, sent the Ifields holiday gifts and small contributions of money. She also offered the testimony of Blanca Rodriguez Ropes, a notary with the law firm of YOUNG, ISHER-WOOD & MARSH, that she (Ropes) had read and explained the document to the Ifields before they signed it.

The evidence is plentiful and conflicting. Dates of certain occurrences, essential to determination of knowledge by the plaintiff of the conveyance to the defendant, are presented in contradictory testimony by the parties involved, the most notable being their inability to agree as to the date of Mr. Ifield's stroke. The significance of this is the fact that Jasper claims that not until that occasion did he have notice of the existence of defendant's deed to the land. While there is proof in the record that plaintiff's building permit was issued in June of 1962, the disparate contentions as to the date of the stroke preclude positive establishment that he was or was not aware of the deed to defendant before building his house. Mr. Jasper insists that the date

of Ifield's stroke was February, 1962, yet adamantly states that when he began building he had no notice of the deed. Mrs. James asserts that the stroke occurred in February of 1963, and that until that time she was not even aware that Mrs. Ifield had a son. It is to be noted that defendant's account of the sequence of events would bear out plaintiff's assertion that, at the time the building permit was issued, he was unaware of the deed. Also, since plaintiff testified that he lived in his own house until Joshua Ifield's illness, it seems clear that the illness could not have occurred until 1963 when the house had been completed, a finding which we adopt.

There is also conflicting testimony as to Joshua Ifield's intentions regarding the disposition of Lot 53A. He himself stated when questioned by the court and counsel, at a session of the court, specially convened at the Grigg Home, for the taking of his testimony, and as it developed, that of the administrator of the institution, that he and Phillipina had agreed to convey both parcels. Mrs. Ropes, who notarized statements previously made in 1963, testified that Ifield had then expressed awareness only of deeding his lot to Mrs. James, and "didn't know anything about the plot that belonged to Jasper's mother." (T. 131). Moreover, the testimony of Beatrice Benjamin, a friend of Mrs. James, to the effect that the grantors claimed not to have heard from Jasper for 11 years, is in direct conflict with that of the plaintiff that he had sent his mother money at irregular intervals while he was living in New York. Moreover, regarding his contributions to his mother, Jasper avowed that before moving to New York City, he had been living and working in Puerto Rico. While so doing, he went on, he had suffered a compensable injury in the course of his employment for which he had received $7,000. He said that he had given $2,000 of that sum to his mother, and this I find to be credible since a savings passbook of the Ifields with Virgin

Islands National Bank was produced showing a one time balance in the vicinity of $2,000, which, in the nature of things, is a sum of money the Ifields could hardly have accumulated, or otherwise acquired from any other source, as deduced from the evidence.

The matter is further complicated by the fact that Joshua Ifield has been confined to the Herbert Grigg Home for the Aged since 1963. Although the witness appeared lucid, communication was difficult because of his extreme age and impaired physical condition. For this reason, one would assume, statements inconsistent with past admissions were not challenged by rigorous cross-examination.

In a case such as this, where no witnesses can agree to a similar set of facts, equitable considerations must be given full play. Mrs. James' claimed generosity and devotion to her uncle and his wife, as well as her alleged promise to bury the surviving spouse, could measure up to adequate consideration for the conveyance of real estate. On the other hand, illiteracy and the infirmity of a party's communicative senses ought not to be the sole foundation of a gift to an individual to the exclusion of the donor's flesh and blood. Doubt as to Mrs. Ifield's comprehension of business affairs is raised by the fact that in 1949 her husband took ownership of a parcel of land, as sole grantee, which had been paid for entirely by Mrs. Ifield and her former husband Holder. Despite an assertion that Mrs. Ifield never questioned the legal title to Ifield, an inference of other than complete acquiescence may be drawn. It is equally logical to infer that she was not aware of the legal intricacies of title, or even made aware of the form in which it was taken. The fact that she co-signed the deed conveying the land to defendant may support the theory that she continued in the belief that she had an interest in the property. If this inference is correct, one logical conclusion is that she was deceived or misled in her belief, there-

fore strengthening the hypothesis of undue influence by her husband in the 1961 conveyance, when her powers of perception were even more diminished than at the time of the transfer of title from the Labor Union. Also, since two parcels of land were conveyed to Mrs. James at the same time, one of which was originally contracted for by Ifield from the Labor Union, and taken by Joshua and Phillipina Ifield as grantees, it is possible that Mrs. Ifield was unaware of the fact that by her "X" she was in addition conveying the property originally bought by herself and Holder.

■ ■ Where an individual is not only ignorant of written language, but seriously deprived of both sight and hearing, the myriad possibilities for confusion and noncomprehension may not be underestimated. Nor can a suggestion of undue influence be entirely ruled out even though it be minimal. *Joseph* v. *Eastman*, 5 V.I. 201, 344 F.2d 9 (3rd Cir. 1965). In that case, a deed by an eighty-five year old woman was set aside on the grounds of mental incapacity and undue influence. The mental deterioration was manifested by confusion, irrational behavior and lack of concern for personal and domestic hygiene. The main thrust of the decision was based on mental incapacity, but the appellate court refused to set aside the finding of undue influence even though "the affirmative evidence . . . in support of the finding that Eastman had actually exerted undue influence over Mrs. Joseph is minimal." 344 F.2d at 13. In Mrs. Ifield's case, her limited powers of comprehension, due as much to physical as to mental disabilities, and the close relationship between Ifield and James, raise a double inference of undue influence which has been in no wise rebutted. Although old age and mental or physical infirmity are not enough, in and of themselves, to set aside a conveyance of real property, they are important factors

241

to be considered when attended with inequitable incidents. Wilke v. Sassen, 123 Iowa 421, 99 N.W. 124 (1904).

In Kemp v. Kemp, 254 So.2d 876 (Miss. 1971), although there was no recitation of the inequitable incidents, the court set aside a deed from a 77-year-old woman, enfeebled by cerebral insufficiency, in favor of her late husband's nephew. The consideration involved was $10 and past favors of "no particular monetary value." This bears on the case at bar in that the moving consideration from Mrs. James, also $10, plus the promise to pay for the funeral expenses, must be viewed in light of the fact that much, if not all of the cost of Mr. Ifield's eventual funeral is to be paid by Social Security (T. 13).

In addition to the equitable factors mitigating against Mrs. Ifield's capacity, there are those operating directly in favor of Mr. Jasper. It is unlikely that a man with limited resources would knowingly take the risk of building a house on property, the ownership of which is in controversy. Indeed, during the course of the trial, Jasper made statements to that effect. Nor is it probable that his mother, despite her limitations, would permit such an expenditure to be made if she had fully appreciated the significance of her actions in 1961. Her grant of permission to build in 1962, points toward a lack of awareness of that conveyance, or else once more, to incompetence.

Moreover, at the time of the conveyance in question, Mrs. James was granted another parcel of land by the Ifields, the validity of which transfer is not here in question. While it is not the court's office to step in and apportion the land, it may consider the fact that, were Mrs. James to prevail, she would be the owner of two parcels while Jasper would not only have none, but would be forced to pay rent or give up (or remove, tantamount to destruction) the house he built.

■ Jasper, between the time of his stepfather's illness in 1963, and his mother's death in 1967, lived with and cared for the latter, even hiring a woman, the more fully to tend to Mrs. Ifield's needs. Then too, he contributed a substantial amount of his own money towards improvements of the Ifield residence, as well as building his own home on the property. No sound reason appears why Phillipina should give her property to defendant, a perfect stranger (for the record does not indicate that decedent knew Mrs. James prior to her 1961 visit), and unrelated. The logical explanation would be that she was persuaded to do so by her husband. Indeed, there is testimony that he admitted this to be the fact. That he could, and probably did, exercise undue influence over her, may be inferred from the fact that he obtained title to No. 53A from the Labor Union in his sole name when there is not a shred of evidence to indicate his entitlement thereto. Also to be considered is (a) her age (80) at the time of the conveyance; (b) the fact that she was partially deaf; (c) that she was totally blind; and (d) that she received either no consideration, or at best, woefully inadequate consideration. Additionally, it is a circumstance unfavorable to grantee that she alone contacted the lawyers and took the couple's legal documents to the attorneys. She only gave the lawyers instructions as to what was to be done, and paid counsel fees. Mrs. Ifield was not represented by counsel, indeed never had the opportunity to even confer with defendant's attorneys. Besides all that, this elderly, partially deaf, blind lady signed the document of conveyance without any independent advice or guidance, lay or professional. Without indicating particular, if any significance thereto, it is a fact deserving incidental mention that it was the same lawyers who had represented defendant in the preparation of the challenged deed, who after having heard Ifield's confession that 53A was his wife's sole property, commenced

this action to have the said deed cancelled. In the face of all this, I cannot but conclude that as to Phillipina Ifield, the deed should be cancelled and title to Plot No. 53A shall revert to her.

Unquestionably, had this suit been one by Phillipina to recover Plot No. 53A from Joshua Ifield, she would have been entitled to judgment. How it came about that the conveyance was to him, as we have said, does not appear. Nor do we know from this record what was the state of Mrs. Ifield's sight and hearing, when in 1949, Ifield was granted title. Perhaps these afflictions may have come upon her subsequently and suddenly though one tends to doubt that this was the case. Her illiteracy is beyond question, however, and this circumstance, together with the lack of any consideration moving from Ifield, and the confidential relationship of husband and wife, suffice to lead me to the conclusion that her estate, as against Joshua Ifield, is entitled to the legal fee title of Plot No. 53A. It was against this possible result that the court insisted that Ifield be made a party. For the same reasons I conclude also that a constructive trust should be declared with Ifield having held title in trust for Phillipina Solomon Ifield. The subject plot should be decreed to be an asset of her estate. These conclusions are buttressed if reinforcement be needed, by the testimony of Blanca M. Ropes, that Ifield had stated that he had no proprietary interest in the plot and that it was his wife's property.

Let judgment enter in favor of plaintiff, and against defendants James and Ifield, in accordance with the foregoing.